# In the United States Court of Federal Claims

No. 17-1348C
(Filed Under Seal: December 14, 2017)
(Reissued for Publication: January 18, 2018)[*]

```
*************************************
CENTERRA GROUP, LLC,            *
                                *
          Plaintiff,            *
                                *
v.                              *
                                *   Postaward Bid Protest; Cross-Motions for
THE UNITED STATES,              *   Judgment on the Administrative Record;
                                *   Standing; Evaluation of Technical and Price
          Defendant,            *   Proposals; Tradeoff Analysis
                                *
and                             *
                                *
SOC LLC,                        *
                                *
          Defendant-Intervenor. *
*************************************
```

Richard J. Webber, Washington, DC, for plaintiff.

Eric E. Laufgraben, United States Department of Justice, Washington, DC, for defendant.

James J. McCullough, Washington, DC, for defendant-intervenor.

## OPINION AND ORDER

**SWEENEY**, Judge

In this postaward bid protest, plaintiff Centerra Group, LLC ("Centerra") contends that the National Nuclear Security Administration ("NNSA") improperly awarded a contract for protective force services to defendant-intervenor SOC LLC ("SOC"). Specifically, Centerra

---

[*] In a January 12, 2018 joint status report, the parties proposed redactions to this decision. They agreed on most of the proposed redactions. However, plaintiff and defendant did not agree with defendant-intervenor's proposal to redact the term "Corporate Governance Board." Because that term is not "protected information" under the protective order, the court concludes that it should not be redacted. Redactions are indicated with a bracketed ellipsis ("[. . .]").

alleges that the NNSA's evaluation of proposals and subsequent tradeoff decision were flawed. Before the court are the parties' cross-motions for judgment on the administrative record. As explained below, the court denies Centerra's motion, grants defendant's motion, and grants in part and denies in part SOC's motion.

## I.  BACKGROUND

### A.  The Solicitation and Submission of Proposals

The NNSA issued solicitation DE-SOL-0009373 on December 1, 2016, to acquire force protection services for its Nevada Field Office ("NFO").  Administrative R. ("AR") 900-01, 959. According to the solicitation's Performance Work Statement ("PWS"):

> The primary missions of NNSA/NFO are to support the Stockpile Stewardship, Nonproliferation, Counter Terrorism, Strategic Partnership . . . , Radioactive Waste Management, and National Emergency Response programs while providing a venue for other national security activities.  . . .
>
> NNSA/NFO is responsible for implementing operational safety and security program requirements associated with meeting mission requirements. The NNSA/NFO provides a denial strategy to prevent access to nuclear explosive devices or prevent removal of Category I special nuclear material but ensures that recapture/recovery capabilities continue to exist in the event that a denial strategy fails.  NNSA/NFO has developed management and operating plans to provide adequate protective force protection and physical security systems and barriers commensurate with threat guidance documents.

Id. at 959.  In furtherance of these requirements, the successful offeror would be required to perform tasks in five areas:  General Management, Protective Force, Technical Security Systems, Force-on-Force Exercises, and Reports and Deliverables.  Id. at 960-74.  Of relevance in this protest, General Management tasks would be performed on a firm-fixed-price basis, and Protective Force tasks would be performed on a time-and-materials basis.[1]  Id. at 960, 970.  The NNSA contemplated awarding a contract with an initial term of one year and four one-year option periods.  Id. at 903.

Pursuant to section L of the solicitation, offerors were to submit separate technical and price proposals.  Id. at 1244.  The technical proposal was to contain sections describing the offeror's (1) approach and staffing plan, (2) past performance, and (3) small business participation plan.  Id. at 1250-52.  The first section of the technical proposal was to include the following information:

---

[1]  In a number of the documents included in the administrative record, "firm-fixed price" is abbreviated as "FFP" and "time and materials" is abbreviated as "T&M."

(A)  Approach:  The Offeror shall describe its proposed technical approach for accomplishing . . . the PWS.  As part of the proposed approach, address any technical risks associated with performing these requirements and the proposed approach to avoid or minimize those technical risks.

      . . . .

(B)  Staffing Plan:  The Offeror shall describe the labor categories and job duties of all proposed labor categories to perform the work required by the entire PWS. The plan shall also identify the estimated quantity of proposed full-time equivalent [("FTE") employees] allocated to each labor category for the basic period and for each option period as well as in a Staffing Plan Summary (see Attachment 11).  Additionally, the Offeror shall describe its proposed approach for ensuring sufficiency of staffing pool resources to respond promptly to problems or program changes.  The Offeror shall provide written resumes for the personnel who will perform as Key personnel . . . for accomplishing the requirements of the PWS.

Id. at 1250.  As reflected in the questions and answers incorporated into the solicitation, offerors were to propose a staffing plan based on the information provided in the solicitation and their proposed technical approach; the NNSA expressly declined to provide offerors with information regarding existing staffing beyond what was included in the solicitation.  Id. at 1300, 1313, 1315.

The price proposal, in turn, was to include detailed information concerning labor costs for the contract's base period and the four option years.  Id. at 1252, 1254.  Under the heading "Overview and General Requirements," the NNSA provided:

The Offeror shall identify its proposed prices by completing and submitting the Cost Model . . . (see Attachment 23), which accommodates both the FFP and T&M requirements.  The Offeror shall propose fully-burdened (except for profit as discussed above), fixed[] labor rates for all years for the T&M effort as well as firm fixed prices, depending on the item number and PWS area.  The Cost Model includes Government baselined travel and legacy defined benefit pension amounts that all offerors shall use in their proposed prices and these are considered "material" under the T&M effort.  For evaluation purposes, assume the Government baselined [Other Direct Cost ("ODC")] amounts in the Cost Model include all direct and indirect costs that shall not be further burdened by Offerors. . . . Exclude the Government baselined legacy defined benefit pension plan costs from the fringe pool and include them in ODCs.

Id. at 1252; accord id. at 1310 (indicating, in the questions and answers incorporated into the solicitation, that "[a]ll legacy defined benefit pensions and related costs shall be in ODCs and

shall not be included in the FFP or the T&M rates"); see also id. at 1274-92 (containing Attachment 23, the Cost Model).  In addition, the NNSA cautioned:

> [U]nreasonably low or high proposed costs or prices may be grounds for eliminating a proposal from consideration on the basis that the Offeror does not understand the requirements, has made a mistake, or has made an unreasonable offer.  If estimated costs/prices to perform the proposed effort have been decreased due to efficiencies or management decision, provide complete rationale for the reduction.  The burden of proof for credibility of proposed costs/prices rests with the Offeror.

Id. at 1253.

Then, under the heading "Specific Cost/Price Requirements," the NNSA provided the following pertinent instructions:

> (2)  Offerors shall propose prices based on the PWS . . . , the Informational Staffing Schedule (see Attachment 17), and the price proposal instructions contained herein.  . . .
>
> (3)  The Offeror shall address the basis of estimate to support the proposed hours. A description of how the quantity and mix of labor hours were estimated shall be provided.  The Offeror shall identify the basis for the proposed labor rates and explain how the rates are adjusted (e.g., blended rates, weighted averages, etc.), if applicable, to arrive at the proposed rates.  Clearly identify and explain the basis for any annual escalation factors employed.
>
> (4)  The Offeror shall indicate the total number of [Direct Productive Labor Hours ("DPLH")] estimated per year for one [FTE] employee.  The Offeror shall demonstrate how its DPLH is calculated by identifying the number of annual hours estimated for each type of non-productive time such as vacation, holiday, sick leave, administrative leave, and other types of non-direct charged activities in accordance with its current compensation policies.

Id. at 1254; see also id. at 1262-63 (containing Attachment 17, the Informational Staffing Schedule, a document that includes a list of positions and the number of personnel at each position, and also includes the following remark:  "This generic Staffing Schedule is for informational purposes only and identifies the positions directly engaged in ProForce or Security Systems work.  The offerors are expected to propose staffing in accordance with their technical approach based on the work identified in the [PWS].").

In section M of the solicitation, the NNSA described how it planned to evaluate the proposals.  Id. at 1259-61.  With respect to the evaluation process in general, the NNSA advised

that it intended to award the contract "without discussions," but reserved the right to conduct discussions if later deemed necessary.  Id. at 1259.  It further advised:

> Exceptions or deviations to any terms and conditions alone will not render the proposal unacceptable; however, any exceptions or deviations to the terms of the solicitation may make the proposal unacceptable for award without discussions. If an Offeror proposes exceptions to the terms and conditions of the contract, the Government may make an award without discussions to another Offeror that did not take exception to the terms and conditions of the solicitation.

Id.

Then, with respect to the substance of the evaluations, the NNSA stated that it intended to award the contract to the offeror with the proposal "determined to be the best value and most advantageous to the Government, based on four factors (in descending order of importance)": (1) Approach and Staffing Plan, (2) Past Performance, (3) Small Business Participation Plan, and (4) Price. Id. at 1260.  Specifically, with respect to the factors at issue in this protest, the NNSA advised:

> Criterion 1 - Approach and Staffing Plan
>
> In evaluating Criterion 1, the Government will evaluate Offerors['] responses to Approach and Staffing Plans.  These are equal in weight, and will not . . . receive individual ratings.  . . .
>
> > (i)  Approach:  The Government will evaluate the information provided by the Offeror . . . to . . . assess (i) the Offeror's understanding of the requirements; and (ii) the completeness and feasibility of the proposed technical approach.  Additionally, the Government will evaluate the extent to which the Offeror's responses demonstrate an understanding of relevant technical risks as well as the completeness and feasibility of the Offeror's approach to avoid or minimize those risks.
> >
> > (ii)  Staffing Plan:  The Government will evaluate the information provided by the Offeror . . . to assess whether the Offeror has proposed a sufficient level of staffing and mix of skills throughout contract performance.  The Government will evaluate whether key personnel have the relevant qualifications, education, and experience necessary to effectively execute the duties and responsibilities for their proposed positions considering the work required in the PWS.  . . .
> >
> > . . . .

Criterion 4 - Price

> The price proposal will not be rated, but will be used in determining the best value to the Government . . . .  The total evaluated price will be analyzed in accordance with [Federal Acquisition Regulation ("FAR")] 15.404 to determine reasonableness and balanced pricing.  The total evaluated price is the sum total of the proposed fixed prices and cost estimates for the Base Period and Option Periods, to include the Government baselined [ODCs], and the Government's calculated price for the six-month Option to Extend Services period.  A significant cost/price deficiency or weakness that may cause the proposal to be rejected is defined as an aspect of the Price Proposal that is lacking in reasonableness, and the correction of which would cause a material alteration or revision of the Offeror's price proposal.  An unreasonable, or unbalanced price proposal may adversely affect the Offeror's rating.  Pursuant to FAR 15.404, the following will be evaluated:

>> (1)  Reasonableness.  The total evaluated price, including all elements thereof, will be used to evaluate reasonableness.  The price proposal will be evaluated to determine the appropriateness of the underlying assumptions and estimating techniques used to generate the proposed costs/prices and the consistency of those assumptions and techniques with the proposed accomplishment of the required work.  The Government may use any of the cost or price analysis techniques specified in FAR 15.404 to determine reasonableness.

>> (2)  Balanced Pricing.  In accordance with FAR . . . 15.404-1(g), the Government will analyze the proposed Item and annual pricing for balance and may reject a proposal if the contracting officer determines that the lack of balance poses an unacceptable risk to the Government.

Id. at 1260-61; see also id. at 4-5 (providing no indication in the NNSA's Source Evaluation Plan that the NNSA would refer to an offeror's price proposal when evaluating its technical proposal). Finally, the NNSA advised:

> In selecting the best value, the Government is more concerned with obtaining a superior Technical Proposal (Criterion 1-3) than making an award at the lowest evaluated price, and, accordingly, when combined, the three non-price criteria are significantly more important than price.  However, the Government will not make an award at a price premium it considers disproportionate to the benefits associated with the evaluated superiority of one Technical Proposal over another.  Thus, to the extent that Offerors' Technical Proposals are evaluated as

close or similar in merit, the evaluated price is more likely to be a determining factor.

Id. at 1260.

The deadline for submitting proposals to the NNSA was January 18, 2017.  Id. at 1249. Timely proposals were submitted by two offerors:  Centerra, the incumbent contractor, and SOC. Id. at 3592.  See generally id. at 1532-2385 (Centerra proposal), 2386-879 (SOC proposal).

## B.  Evaluation of Technical Proposals

The technical proposals were evaluated by a three-member Integrated Project Team ("IPT").  Id. at 3590, 3601.  With respect to Criterion 1 (Approach and Staffing Plan), the IPT (1) identified each proposals' significant strengths, strengths, weaknesses, significant weaknesses, and deficiencies, and (2) assigned each proposal one of four possible adjectival ratings–Excellent, Good, Satisfactory, or Less Than Satisfactory.  Id. at 3594; see also id. at 6 (noting that a Good rating meant that "[t]he requirements [were] addressed in a comprehensive manner normally evidenced by strengths that outweigh[ed] any weaknesses and a high probability of successful contract performance with a moderate degree of risk," and that a Satisfactory rating meant that "[t]he requirements [were] addressed in an acceptable manner normally evidenced by strengths and weaknesses that [were] generally offsetting and a reasonable probability of successful contract performance with a moderate degree of risk").

Upon reviewing Centerra's proposal under Criterion 1, the IPT identified one significant strength, three strengths, and one weakness for the Approach element of the criterion, and two significant strengths, one strength, and two weaknesses for the Staffing Plan element of the criterion.  Id. at 3610.  In its narrative evaluation, the IPT provided, in relevant part:

Evaluation of (A) Technical Approach

. . . .

Centerra's approach . . . is similar to how [it is] currently operating.  . . . The feasibility of Centerra's approach is, to an extent, demonstrated by Centerra's implementation of this approach at the NFO for over 51 years . . . .  Centerra's approach, combined with the demonstrated feasibility of its approach, represents a significant benefit to the Government, as it appreciably increases the potential of successful contract performance; thus, it is a SIGN[I]FICANT STRENGTH.

. . . .

Evaluation of (B) Staffing Plan

 . . . .

 As compared to [Request for Proposal ("RFP")] Attachment 17, Centerra's staffing plan added four new labor categories pertaining to Protective Force:  [. . .].  There are a significant number of positions that, when compare[d] to the [Independent Government Cost Estimate], are assigned titles of "manager" or "director," giving the appearance of a "top-heavy" organization.  There are additional labor categories identified by the [subject matter experts] evaluating the staffing plan that appear to be of a greater number than what would be required to accomplish the tasks.  . . .

 Centerra identifies a Classification Officer position as required in the PWS . . . .  However, the description of duties for this position do[es] not indicate a full understanding of the duties of a Classification Officer in accordance with [United States Department of Energy] orders or as described in the PWS.  Centerra proposes a collateral assignment of the Classification Officer as [. . .] support. The Government is concerned with one individual supporting both roles as this is likely to be an insufficient level of staffing to successfully perform the related aspects of the PWS and represents a <u>WEAKNESS</u>.

 . . . .

 [With respect to the Director of Technical Services position, the proposed individual's] extremely limited educational and management experience[] increases the risk of unsuccessful contract performance, and is a <u>WEAKNESS</u>.

 . . . .

 Overall, the Centerra staffing plan is viable for successful contract performance.

<u>Id.</u> at 3601-10.  In sum, the IPT concluded:

 Except in the one instance noted, Centerra's technical approaches demonstrated that Centerra had a comprehensive understanding of the requirements and relevant technical risks in the evaluated categories, and presented feasible performance approaches and risk mitigation strategies. Centerra's staffing plan appeared to present a sufficient level of staffing and mix of skills (with one exception). . . .

 . . . .

-8-

Centerra's proposal[] included beneficial aspects in both its Approach and Key Personnel, as indicated by its Significant Strengths and Strengths. These aspects of its proposal outweighed its three assigned Weaknesses. NNSA notes that the role of Classification Officer was not required to be handled by one distinct person, but NNSA has determined that this collateral assignment carries some risk that the individual may encounter obstacles to fully perform his or her duties. Of more concern is [a specified individual's] lack of qualifications, education, and experience for his proposed role as the Director of Technical Services. However, the IPT is hopeful that Centerra's strong Program Manager and Deputy Program Manager could moderate the risk posed by [this individual's] lack of qualifications, education, and experience. As such, Centerra's Approach and Staffing Plan[] was considered to have a moderate degree of risk with Significant Strengths and Strengths that outweighed the three, identified weaknesses; therefore, it[] was rated: GOOD.

Id. at 3610-11.

Then, upon reviewing SOC's proposal on Criterion 1, the IPT identified one significant strength and seven strengths for the Approach element of the criterion, and three significant strengths, one strength, and four weaknesses for the Staffing Plan element of the criterion. Id. at 3626. In its narrative evaluation, the IPT provided, in relevant part:

Evaluation of (B) Staffing Plan

The SOC Staffing Plan provides a lean organization structure that demonstrates a distinct chain of command that should ensure clear lines of communication throughout the organization structure up to the General Manager . . . . The RFP included Attachment 17, Informational Staffing Plan which, based on analysis of the proposal, SOC followed for the assignment of personnel. The SOC staffing plan notes during any absence of the General Manager, the [. . .] will act in his place.

SOC proposes to have the ProForce [. . .] also serve as the [. . .] . . . . The wide range of responsibilities associated with both positions may make this dual-hatted arrangement difficult to accomplish safely and effectively. . . . This is an important PWS function, and the collateral assignment may increase performance risk, thus it is a WEAKNESS.

. . . .

The position of Classification Officer, as stated in the PWS . . . , was initially projected by NNSA to be a stand-alone assignment. SOC has the duties of the Classification Officer as a collateral assignment to the Information Security

-9-

Manager, who also has responsibility for [. . .].  This is an important PWS function, and collaterally assigning it may increase performance risk, and thus it is a <u>WEAKNESS</u>.

. . .  SOC's staffing plan does not include a designated standalone [. . .] position (it seems to be collaterally assigned to the [. . .] . . . .  This is an important PWS function, and collaterally assigning it may increase performance risk, thus, it is a <u>WEAKNESS</u>.

. . .  SOC's proposal identified the Lieutenant positions as [. . .], but did not specifically identify their role as [. . .] . . . .  This is an important function, and collaterally assigning it may increase performance risk, thus, it is a <u>WEAKNESS</u>.

The SOC technical proposal identified the estimated labor categories, FTEs, and description of job duties performed by each position . . . .  The proposal also adequately identified DPLH hours for each FTE and how those hours were calculated for each respective position . . . .

SOC's approach also included the support of a Corporate Governance Board . . . .  This capability provides a strong leadership and oversight capability and is [. . .] at no additional cost to the Government . . . .  This is a <u>STRENGTH</u> because it is a benefit to the Government and increases the potential of successful contract performance.

SOC provided a detailed approach to ensuring sufficiency of staffing pool resources and its ability to respond promptly to problems, short-term emergency operations, and project-specific short term staffing as well as special requests for added security from NFO or NFO contractors for programs or missions.  A work-flow chart was provided . . . describing SOC's process which it[] use[s] at its other contract sites.  . . .  This aspect of the proposal is well supported and documented, and demonstrates that SOC has a viable plan to ensure appropriate levels of staffing a[nd] mixes of labor throughout contract performance.

Analysis of the identified labor categories (other than those noted above) demonstrates an understanding of the work scope and appear[s] to provide an adequate mix of skills . . . .  Overall, despite the added risks associated with its leaner (in some areas) staffing plan, SOC's staffing approach delineated a sufficient level of staffing and mix of skills throughout contract performance (with the four exceptions noted above).

<u>Id.</u> at 3622-23.  In sum, the IPT concluded:

> SOC's technical approaches demonstrated that SOC had a comprehensive understanding of the requirements and relevant technical risks in the evaluated categories, and presented feasible performance approaches and risk mitigation strategies.  While SOC's staffing plan presented sufficient levels of staffing and mix of skills in many areas, there were four instances where it was unclear to the IPT that sufficient staffing had been proposed.  . . .
>
> . . . .
>
> SOC's proposal, as reflected by three of the Significant Strengths, included the use of highly qualified key personnel . . . .  This use of strong key persons, combined with numerous strengths for innovative aspects of its technical approach, outweighed the four weaknesses associated, generally, with the assignment of multiple roles (which NNSA had anticipated as requiring distinct personnel) to one person.  NNSA notes that none of the roles collaterally assigned to individuals are required to be handled by distinct personnel, but NNSA has determined that this collateral assignment carries some risk that an individual may encounter obstacles to fully perform his or her assignments.  However, the IPT anticipates that should SOC encounter overburdened individuals (whether for the noted roles or otherwise), SOC's management team would properly reallocate workload and/or utilize its Corporate Governance Board to determine solutions.  As such, SOC's Approach and Staffing Plan was considered to have a moderate degree of risk, with Significant Strengths and Strengths that outweighed the four, identified Weaknesses; therefore, it was rated:  GOOD.

Id. at 3626-27; see also id. at 2629 (indicating, in SOC's proposal, that one of the "two principal roles" for SOC's Corporate Governance Board was to "provide full corporate reachback for whatever additional resources are required"), 2660 (indicating, in SOC's proposal, that the Corporate Governance Board would "provide[] the [General Manager] with direct access to executive managers from the SOC Team . . . for infusion of expertise, personnel, or funds to resolve program challenges or address contingencies").

Next, with respect to Criterion 2 (Past Performance), the IPT (1) identified each proposals' significant strengths, strengths, weaknesses, significant weaknesses, and deficiencies, and (2) assigned each proposal one of five possible adjectival ratings–Excellent, Good, Satisfactory, Less Than Satisfactory, or Neutral.  Id. at 3595-96.  The IPT assigned an Excellent rating to Centerra's proposal, id. at 3611, 3615, and a Good rating to SOC's proposal, id. at 3627, 3629.

Finally, with respect to Criterion 3 (Small Business Participation Plan), the IPT assigned each proposal one of three possible adjectival ratings–Excellent, Satisfactory, or Less Than Satisfactory.  Id. at 3597.  The IPT assigned an Excellent rating to Centerra's proposal, id. at 3615-16, and a Satisfactory rating to SOC's proposal, id. at 3629-30.

## C. Evaluation of Price Proposals

The IPT also evaluated the offerors' price proposals. Id. at 3632. First, it summarized–and calculated the differences between–the prices and DPLH proposed by the offerors:[2]

Offeror Pricing and Total Evaluated Price

| PWS Area (Contract Type) | CENTERRA | SOC | DELTA $ | DELTA % |
|---|---|---|---|---|
| A:  General Mgt. (FFP) | [. . .] | [. . .] | [. . .] | [. . .] |
| B:  Protective Force (T&M) | [. . .] | [. . .] | [. . .] | [. . .] |
| C:  Tech. Security Systems (T&M) | [. . .] | [. . .] | [. . .] | [. . .] |
| D:  Force-on-Force (T&M) | [. . .] | [. . .] | [. . .] | [. . .] |
| Subtotal | [. . .] | [. . .] | [. . .] | [. . .] |
| Baselined Travel | 500,000 | 500,000 | 0 | 0.0% |
| Baselined Legacy Pensions | 14,500,000 | 14,500,000 | 0 | 0.0% |
| Proposed Transition | [. . .] | [. . .] | [. . .] | [. . .] |
| Total Proposed Price | $249,976,900 | $202,942,951 | $47,033,949 | 23.2% |
| Opt to Ext Svcs Labor | 24,455,101 | 19,130,496 | 5,324,605 | 27.8% |
| Opt to Ext Svcs Baselines | 1,500,000 | 1,500,000 | 0 | 0.0% |
| Total Evaluated Price | $275,932,001 | $223,573,447 | $52,358,554 | 23.4% |

Notes:  . . .  Delta $ = Centerra - SOC.  Delta % = (Centerra / SOC) - 1.  The Option to Extend Services dollars were calculated by the Government . . . .

---

[2]  The three tables that follow are reproduced from the IPT's report.

Proposed Prices Based on Element

| Element | CENTERRA | SOC | Delta $ | Delta % | % of Total |
|---|---|---|---|---|---|
| Wages | [. . .] | [. . .] | [. . .] | [. . .] | [. . .] |
| Indirect Costs | [. . .] | [. . .] | [. . .] | [. . .] | [. . .] |
| Baselined ODCs | [. . .] | [. . .] | [. . .] | [. . .] | [. . .] |
| Transition | [. . .] | [. . .] | [. . .] | [. . .] | [. . .] |
| Profit | [. . .] | [. . .] | [. . .] | [. . .] | [. . .] |
| Total Price | $249,976,900 | $202,942,951 | $47,033,949 | 23.2% | 100.0% |

Notes:  Delta $ = Centerra - SOC, Delta % = (Centerra / SOC) - 1, % of Total = the percent of the Delta $ . . . the element represent[s] (e.g., approximately [. . .]% of the $47,033,949 delta is due to differences in proposed wages).

Proposed Direct Productive Labor Hours (DPLH)

| PWS Area (Contract Type) | CENTERRA | SOC | DELTA DPLH | DELTA % |
|---|---|---|---|---|
| A:  General Mgt. (FFP) | [. . .] | [. . .] | [. . .] | [. . .] |
| B:  Protective Force (T&M) | [. . .] | [. . .] | [. . .] | [. . .] |
| C:  Tech. Security Systems (T&M) | [. . .] | [. . .] | [. . .] | [. . .] |
| D:  Force-on-Force (T&M) | [. . .] | [. . .] | [. . .] | [. . .] |
| Subtotal | [. . .] | [. . .] | [. . .] | [. . .] |
| Opt to Ext Svcs Labor | [. . .] | [. . .] | [. . .] | [. . .] |
| Total Evaluated DPLH | [. . .] | [. . .] | [. . .] | [. . .] |

Notes:  Delta DPLH = Centerra - SOC.  Delta % = (Centerra / SOC) - 1.  The Option to Extend Services labor hours were calculated by the Government . . . .

Id. at 3633-34, 3639.

Next, the IPT described certain statements and assumptions made by the offerors in their price proposals.  Id. at 3635-38.  Relevant to this protest, the IPT noted Centerra's assumption that it would require equitable adjustments, both at the start of and during contract performance, to move defined benefit plan costs for certain employees from the ODC "baselined amount" to either the firm-fixed-price or the time-and-materials rates.  Id. at 3635-36.  The IPT commented:

> The proposed RFP award is a hybrid where the type is either firm-fixed-price (FFP) or T&M dependent upon the [PWS] area.  The Government can change the baselined amounts during performance as necessary, but the proposed T&M rates and firm fixed price effort are set at award.  If Centerra's approach will require the removal of certain labor from the Legacy Defined Benefit Plan, then it should have priced those affected T&M labor rates, or FFP areas, accordingly in its proposal and should not have conditioned its price on contract changes upon award.  Moreover, as new employees are hired, the Government will reimburse the awardee based on the T&M rates set at contract award.  Centerra's assumption is not consistent with the RFP terms and conditions, and constitutes a condition on a firm-fixed-price requirement.  Thus it constitutes an exception to the RFP requirements.

Id. at 3636.

After addressing the offerors' statements and assumptions, the IPT compared the prices proposed by the offerors.  Initially, it offered a general comparison:

> Although the proposed prices are materially different at 23.2% at the bottom-line price, the prices are reasonable for the specific proposed approaches.  Being the incumbent contractor, Centerra's proposed approach generally follows its current concept of operations.  By contrast, SOC was aggressive in its pricing, preferring to demonstrate best value to the Government with a combination of PWS performance and lean affordability.

Id. at 3640.  It then made a more detailed comparison "that reveal[ed] the drivers of the price differences":

> (1)  Labor:  Centerra['s] proposed labor is approximately [. . .]% higher than that proposed by SOC; however, the differences by PWS area are dramatic.  For the General Management area of the PWS, . . . Centerra proposed [. . .]% ([. . .]) more hours than SOC at a price that is [. . .]% ($[. . .]) higher.  However, for all other areas (Protective Force, Technical Security Systems, Force-on-Force) of the PWS, Centerra had only [. . .]% ([. . .]) more hours, but at a price that is [. . .]% ($[. . .]) higher.  Centerra proposed a [. . .]% escalation for all non-union and non-uniformed personnel, and complied with the Collective Bargaining Agreement (CBA) for covered employees.  . . .  SOC complied with the existing

-14-

CBA escalation for covered employees . . . .   SOC did not propose     [. . .] for
Service Contract Act . . . and exempt labor.  In its [price] proposal, . . . SOC
states:

> [. . .]

> (2)  Indirect Cost[s]:  Centerra proposed indirect costs that are
> approximately [. . .]% ($[. . .]) higher than SOC which represent almost [. . .]% of
> the proposed bottom-line price difference.  Since the Government expected
> adequate price competition, a further breakout of indirect costs (Fringe, labor
> overhead, G&A) was not requested.  It is noted, however, that both Offerors
> specified in their [price] proposals that their hourly rates for covered employees
> include all requirements to include starting pay, wages, health and welfare,
> qualification pay, bonus/incentive allowances and any/all other requirements for
> compliance.

> (3)  Other Direct Costs:  Both Offerors proposed the Government
> baselined ODCs as required in the RFP.

> (4)  Transition:  Centerra proposed [. . .] and SOC [. . .] transition costs.

> (5)  Profit:  The Offerors proposed significantly different approaches to
> profit.  Centerra's proposed profit is approximately [. . .] times higher than that
> proposed by SOC.  Centerra proposed a firm fixed price (FFP) profit rate of
> [. . .]% and a T&M profit rate of [. . .]%.  SOC proposed a [. . .]% profit rate for
> the first year (both FFP and T&M) and a [. . .]% profit rate for all years thereafter.
> The different approaches represent a bottom-line delta of $[. . .], where Centerra is
> significantly higher than SOC.  The difference in profit represents approximately
> [. . .]% of the proposed delta between the bottom-line positions.

> As demonstrated above, the bottom-line difference between the proposed
> positions is material, but both proposed offers are reasonable for the specific
> proposed approaches.  Centerra has chosen a technical and pricing approach that
> is generally consistent with its current concept of operations, while SOC addresses
> the technical requirements of the RFP and endeavors to reduce costs to the
> Government by proposing a reduced management structure and lower indirect and
> profit rates.

Id. at 3640-41; see also id. at 17-18 (addressing, in the NNSA's Acquisition Plan, the projected
cost of the contract, and remarking that "[t]he projected cost . . . is based on current negotiated
labor rates, with an escalation factor of 0% to 2.5% being applied to each year").  The IPT
concluded that both offerors proposed reasonable and balanced prices.  Id. at 3643.

**D.  The Source Selection Decision**

The IPT provided its findings to the Source Selection Authority ("SSA") in a May 1, 2017 report, id. at 3590, and during a May 8, 2017 presentation, id. at 3700.  The SSA then prepared a Source Selection Decision Document.  Id. at 3721-27.  In that document, the SSA first noted his agreement with the IPT's findings:

> As the SSA, I am satisfied that the IPT's evaluation of proposals was rigorous, thorough, and compliant with the established evaluation criteria, the Source Evaluation Plan, and applicable laws and regulations.  After a close and thorough examination of the comprehensive IPT report, I agree with the IPT's technical ratings and price evaluations.

Id. at 3723.  Then, after remarking that "SOC had the lowest evaluated price, by over $52 million," while "the IPT's evaluation suggest[ed] that in some respects, Centerra's proposal was more advantageous" under the Past Performance and Small Business Subcontracting Plan criteria, the SSA engaged in a detailed review of the two proposals.  Id.  With respect to the offerors' proposed staffing plans and Criterion 1 overall, the SSA noted:

> Both Offerors provided staffing approaches that, while differing in their distribution and assignment of personnel, generally propose sufficient staffing and skill mixes.  While both Centerra and SOC received a weakness for not demonstrating a complete understanding of the duties of the classification officer position, and for assigning dual-hat responsibilities that could potentially increase the performance risk, SOC received three additional weaknesses related to its staffing plan.  The IPT noted its concerns with SOC's approach in which it dual-hatted the [. . .], did not assign a dedicated [. . .], and did not have a full-time dedicated [. . .] (it distributed responsibilities across more than one person).  However, SOC received a strength for including the support of a Corporate Governance Board for leadership and oversight capability at no additional cost to the Government.
>
> . . . .
>
> For Criterion 1, even though SOC has a higher total of significant strengths, strengths, and weaknesses; I agree with the IPT and find that Centerra and SOC both merit ratings of "Good."  Though each has distinct advantages (and disadvantages), overall, I find the two proposals to present a substantially similar range of benefits (outweighing each proposals identified weaknesses) to the Government.

Id. at 3725.  And, with respect to the offerors' proposed prices, the SSA noted:

Although the proposed prices are materially different (23.4% of the evaluated price), the prices are reasonable for the respective proposed approaches. Being the incumbent contractor, Centerra's proposed approach generally follows its current concept of operations. By contrast, SOC appeared more aggressive in its pricing, preferring to demonstrate best value to the Government with a combination of PWS performance and lean affordability. This is not the only reason for the price difference. As noted in . . . the IPT report, Centerra proposed indirect costs that are approximately $[. . .], or [. . .]%, higher than SOC's which represents almost [. . .]% of the difference in the proposed price. In addition, the Offerors proposed significantly different approaches to profit. Centerra's proposed profit is approximately $[. . .], or [. . .]%, higher than that profit proposed by SOC. The difference in profit represents approximately [. . .]% of the difference in the proposed price. I, as the SSA, agree with the assessment of the variance between Centerra and SOC based on the price analysis described above. Overall, I find that the proposed pricing is reasonable and balanced (with no evidence of unbalanced pricing).

Additionally, I note that during the pricing evaluation, the IPT identified that Centerra took exception to a firm-fixed-price aspect of the RFP. Centerra identified that "[a]t contract start, [it would] require an equitable adjustment," to relocate benefit costs from the other direct cost baselined amount to "the Firm Fixed Price or T&M rates." Though labeled only as an assumption, it conditioned performance on the Government granting it the ability to raise fixed prices and labor rates. In my opinion, this condition would need to be resolved through discussions.[3]

Id. at 3726-27 (footnote added).

Finally, the SSA performed a tradeoff analysis to reach his source selection decision:

Based on the IPT's analysis and my independent judgment in comparing the proposals in terms of Approach and Staffing Plan (Criterion 1), Past Performance (Criterion 2), and Small Business Participation Plan (Criterion 3), I find that the benefits associated with Centerra's proposal (primarily in the form of past performance and proposed small business participation) compared to SOC's proposal do not justify the additional $52 million price premium.

With regard to Criterion 1, both Offerors had similar levels of benefits to the Government: a few key personnel with strong experiences, and beneficial (though different) approaches. As both Offerors provided viable approaches with some weaknesses that were outweighed by respective benefits, this Criterion was

---

[3] The NNSA had not conducted discussions with the offerors. AR 3702.

not, in-and-of-itself, a discriminating factor in favor of one Offeror over the other. The primary discriminating non-price factors were associated with the level of confidence associated with the difference in past performance depth and proposed use of small businesses.  Under both Criteria 2 and 3, Centerra's proposal presented more beneficial aspects than did SOC's.  These benefits were, in essence:  (a) a slightly higher evaluated probability that Centerra could successfully perform the PWS requirements; and (b) a more significant opportunity for the use of small businesses (which would count toward NNSA's overall goals to provide work to small business entities).  The evaluation of SOC's proposal under Criteria 2 and 3[] yielded evidence of Good past performance history and moderate opportunities for small businesses.  Those slight differences aside, I believe either Offeror is capable of ensuring effective and efficient contract performance.

I acknowledge that [the solicitation] states, ". . . when combined, the three non-price criteria are significantly more important than price."  However, it also identifies that, "the Government will not make an award at a price premium it considers disproportionate to the benefits associated with the evaluated superiority of one Technical Proposal over another."

The price premium associated with Centerra's proposal is not justified by the evaluated superiority of Centerra in relation to Criteria 2 and 3.  Under the most important non-price factor, Approach and Staffing Plan, both Centerra and SOC were evaluated to present similarly beneficial (though different) technical approaches and staffing plans.  As such, should Centerra receive the award, the Government would be paying a 23% price premium for a slightly higher probability of successful performance and a greater use of small businesses. Under no circumstances are these advantages worth the 23% price premium (or $52 million over the potential contract performance period).  Therefore, even if Centerra's exception (noted . . . above) was somehow resolved or deemed immaterial, it is not in the best interest of the Government, nor in line with the stated evaluation criteria for trade-off, to issue an award to Centerra at the proposed 23% price premium.  As stated above, SOC's proposal demonstrated that it was more than capable of performing the work, and would, in my judgment, provide performance and benefits proportionate to its evaluated price.

Id. at 3727; see also id. at 3806 (reflecting that the NNSA advised Centerra during its debriefing that the SSA made the following determinations:  (1) Centerra's exception was "something that would need to be resolved through discussions in order to make Centerra eligible for award," and (2) "even if the exception was somehow resolved or deemed immaterial, SOC's proposal represented the best value to the Government").  The SSA concluded:

> In accordance with the RFP, considering the IPT evaluation, and using my independent review and judgment, I find that SOC's proposal represents the best value to the Government.  Therefore, I have selected SOC for award of the "Protective Force Services" contract to support the NNSA [NFO].

Id. at 3727.

### E.  Contract Award and Debriefing

On May 30, 2017, the NNSA notified both offerors that it had awarded the contract to SOC.  Id. at 3728-30, 3779-81.  It then provided a written debriefing to both offerors on June 8, 2017.  Id. at 3798-812.

### F.  Procedural History

Four days after its debriefing, Centerra lodged a protest with the Government Accountability Office ("GAO").  Id. at 3814.  It then lodged a supplemental protest with the GAO on July 24, 2017.  Id. at 3950.  The GAO denied Centerra's protests on September 21, 2017.  Id. at 4068.

Six days later, on September 27, 2017, Centerra filed the instant protest.  In its complaint, it alleges that the NNSA (1) improperly evaluated SOC's staffing plan, (2) improperly evaluated the proposals on the Price criterion, and (3) erred in its tradeoff decision.  Pursuant to a schedule proposed by the parties, briefing on cross-motions for judgment on the administrative record concluded on December 6, 2017, and the court heard argument on December 13, 2017.[4]

## II.  DISCUSSION

In ruling on motions for judgment on the administrative record pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)).  Because the court makes "factual findings . . . from the record evidence," judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the administrative record."  Bannum, Inc., 404 F.3d at 1356.

---

[4]  During the initial status conference, defense counsel represented that the NNSA had agreed to stay performance of the contract awarded to SOC during this protest.

## A.  Centerra's Standing to Protest

The United States Court of Federal Claims ("Court of Federal Claims") possesses "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1) (2012), and may "award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs," id. § 1491(b)(2).  In its cross-motion for judgment on the administrative record, SOC argues, as a threshold matter, that Centerra is not an interested party and therefore lacks standing to protest the NNSA's contract award.  Centerra, of course, disagrees.[5]

### 1.  Legal Standard

"[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  Warth v. Seldin, 422 U.S. 490, 498 (1975). "Traditional standing analysis invokes the 'case or controversy' requirement of Article III of the Constitution."  Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1382 (Fed. Cir. 2012).  However, in bid protests, standing "is framed by 28 U.S.C. § 1491(b)(1), which . . . imposes more stringent standing requirements than Article III."  Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009).  As noted above, under 28 U.S.C. § 1491(b)(1), bid protests may only be brought by "interested parties."  The term "interested party" is construed in accordance with the Competition in Contracting Act of 1984 and, accordingly, "standing under § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (citing 31 U.S.C. § 3551(2)(A) (2000)); see also Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (interpreting this standard as requiring a protestor to show that it was an interested party prejudiced by the procuring agency's action and holding that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits"); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (defining "prejudice" as "injury").  Therefore, a party lodging a protest must establish that it "(1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest."  Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006); see also Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992) (noting that the burden of establishing standing is on "[t]he party invoking federal jurisdiction").

---

[5]  Defendant did not raise the issue of Centerra's standing to protest in either its cross-motion or its reply in support of its cross-motion.  Nor did defendant provide any indication that it supported SOC's contention that Centerra lacks standing to protest.  However, when queried during oral argument regarding defendant's legal position on the issue, defense counsel stated that based on the specific facts and circumstances of this case, it does not take the position that Centerra lacks standing to protest.

## 2. Centerra Has Standing to Protest

Conceding, as it must, that Centerra was an actual offeror in the procurement at issue, SOC's standing argument pertains only to whether Centerra has a direct economic interest in the award of the contract.  To prove that it possesses a direct economic interest, a protestor must show that it had a "substantial chance" of being awarded the contract.  Rex Serv. Corp., 448 F.3d at 1307; see also Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1334 (Fed. Cir. 2001) (noting that a protestor who could not be awarded the contract if its protest was successful–because it "did not submit a proposal," "withdrew from the procurement," or "rated below second"–lacks an "economic interest in the outcome" of the protest).  "In other words, the protestor's chance of securing the award must not have been insubstantial."  Info. Tech. & Applications Corp., 316 F.3d at 1319.  According to SOC, Centerra did not have a substantial chance of being awarded the contract because it conditioned portions "of its price proposal on future equitable adjustments by the NNSA," rendering its proposal "materially noncompliant with the terms of the" solicitation.  SOC Cross-Mot. 12.

As SOC notes, in section L of the solicitation, the NNSA both advised offerors that legacy defined benefit pension costs were included in the government's baselined ODCs and prohibited offerors from increasing those amounts.  The NNSA confirmed its position during the question-and-answer period, advising offerors that legacy defined benefit pension costs were included in ODCs and not in the firm-fixed-price or time-and-materials rates.  Nevertheless, Centerra indicated in its proposal–as a "pricing assumption"–that if it was awarded the contract, it would seek equitable adjustments to shift legacy defined benefit pension costs from ODCs to the firm-fixed-price or time-and-materials rates.  Both the IPT and the SSA considered this representation to constitute an exception to the requirements of the solicitation.[6]

In support of its contention that the condition imposed by Centerra on its price proposal rendered the proposal nonresponsive, depriving Centerra of standing to protest the NNSA's award decision, SOC relies on several decisions of the Court of Federal Claims in which offerors who had submitted conditioned proposals were found to lack standing to protest because they did not have a substantial chance of being awarded the contract.  See, e.g., U.S. Sec. Assocs., Inc. v. United States, 124 Fed. Cl. 433, 437 (2015) ("The offer tendered by [the protestor] . . . cannot be accepted by the government without the addition of new terms.  In the context of a fixed price procurement, that makes the protestor's bid non-responsive and deprives it of standing to challenge the award."); Bannum, Inc. v. United States, No. 14-40C, 2014 WL 1373739, *4 (Fed. Cl. Apr. 8, 2014) (unpublished decision) (agreeing that the protestor "did not have a substantial chance of winning the contract because [its] proposal was nonresponsive to the terms of the solicitation," in that the protestor "conditioned its proposal on future price adjustments"), aff'd on other grounds, 779 F.3d 1376 (Fed. Cir. 2015); Bannum, Inc. v. United States, 115 Fed. Cl. 148, 154 (2014) (agreeing that the protestor's proposal was nonresponsive because the protestor

---

[6] Centerra disputes that its "pricing assumption" constituted an exception to the requirements of the solicitation.

"qualified its proposal by expressly representing that its prices did not reflect pricing associated with" the solicitation, and that submission of a noncompliant proposal deprives an offeror of standing to protest the award of a contract because the offeror would have no chance of being awarded the contract), aff'd on other grounds, 779 F.3d at 1376.  However, there is no indication in those decisions that the solicitations at issue contained a provision addressing the consequences of taking exception to a term of the solicitation.

In contrast, the solicitation in this case includes a provision indicating that exceptions to any of the solicitation's terms would not automatically render a proposal unacceptable for award, that exceptions might make a proposal unacceptable for award in the absence of discussions, and that if a proposal contains an exception, the contract could be awarded without discussions to an offeror who did not take exception to the terms of the solicitation.  This provision granted the NNSA the discretion to, among other things, (1) consider Centerra's proposal notwithstanding its belief that Centerra's proposal included an exception, (2) disregard what it considered to be an exception in Centerra's proposal and award the contract to Centerra without discussions, and (3) award the contract to SOC without discussions.  In light of this discretion, and the NNSA's ability to conduct discussions with the offerors at any time prior to contract award, the NNSA possessed the authority to award the contract to Centerra even if Centerra's "pricing assumption" was in fact an exception to a term of the solicitation.  In other words, under the solicitation at issue in this protest, taking exception to a solicitation term would not have automatically rendered Centerra's proposal unacceptable.  Thus, Centerra cannot be described as having an insubstantial chance of being awarded the contract.[7]  It therefore has standing to protest the NNSA's award of the contract to SOC.

## B.  The Merits of Centerra's Protest

In its motion for judgment on the administrative record, Centerra contends that the NNSA's award of the contract to SOC was arbitrary, capricious, and contrary to law because the NNSA improperly evaluated SOC's staffing plan and the price proposals, and the SSA improperly performed the best value tradeoff.  Defendant and SOC both dispute Centerra's contentions.

### 1.  Legal Standard

The court reviews challenged agency actions pursuant to the standards set forth in 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4).  Specifically, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A):  a reviewing court shall set aside the agency

---

[7]  Indeed, if the court were to require the NNSA to reevaluate the proposals, the NNSA could (1) conclude that Centerra's proposal represented the best value and award the contract to Centerra without discussions; or (2) conclude that Centerra's proposal would represent the best value but for the perceived exception, conduct discussions to address the exception, and award the contract to Centerra.

action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Under this standard, the court

> may set aside a procurement action if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  A court reviews a challenge brought on the first ground "to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citations omitted) (quoting Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1332-33); accord Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.").

Procurement officials "are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process."  Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1332-33 (quoting Latecoere Int'l, Inc. v. U.S. Dep't of the Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)).  Thus, the court's review of a procuring agency's decision is "highly deferential."  Advanced Data Concepts, Inc., 216 F.3d at 1058; see also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) ("The court is not empowered to substitute its judgment for that of the agency.").  Furthermore, a "protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater [in negotiated procurements] than in other types of bid protests."  Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004).  And, when a contract is to be awarded on a "best value" basis, procurement officials have "even greater discretion than if the contract were to have been awarded on the basis of cost alone."  Id. (citing E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government.")).

Consistent with the deference accorded to procuring agencies conducting negotiated procurements, when a protestor challenges a procuring agency's evaluation of a technical proposal, the court's "review . . . should be limited to determining whether the evaluation was reasonable, [was] consistent with the stated evaluation criteria and complied with relevant statutory and regulatory requirements."  Banknote Corp. of Am. v. United States, 56 Fed. Cl. 377, 381 (2003), aff'd, 365 F.3d at 1345; accord E.W. Bliss Co., 77 F.3d at 449 ("[T]echnical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess.").  Disagreements with a procuring agency's evaluation, "no matter how vigorous, fall far short of meeting the heavy burden of demonstrating that the findings in question were the

product of an irrational process and hence were arbitrary and capricious."  Banknote Corp. of Am., 56 Fed. Cl. at 384; accord Active Network, LLC v. United States, 130 Fed. Cl. 421, 433 (2017); Tiber Creek Consulting, Inc. v. United States, 129 Fed. Cl. 409, 415 (2016).

In addition to showing "a significant error in the procurement process," a protestor must show "that the error prejudiced it."  Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996); see also Bannum, Inc., 404 F.3d at 1351 (holding that if the procuring agency's decision lacked a rational basis or was made in violation of the applicable statutes, regulations, or procedures, the court must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct").  "To establish prejudice . . . , a protester must show that there was a 'substantial chance' it would have received the contract award absent the alleged error."  Banknote Corp. of Am., 365 F.3d at 1350 (quoting Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086 (Fed. Cir. 2001)); see also Data Gen. Corp., 78 F.3d at 1562 ("[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract.").

## 2. The NNSA Properly Evaluated SOC's Staffing Plan

Centerra's first contention is that the NNSA's evaluation of SOC's staffing plan under Criterion 1 was arbitrary, capricious, and inconsistent with the evaluation criteria in three respects.  First, it asserts that the NNSA did not support its conclusion that SOC's proposed staffing level was sufficient to perform the General Management tasks described in the solicitation.  Second, it claims that the NNSA asserted a nonsensical rationale for discounting the weaknesses it assigned to SOC's proposal for having one employee perform the duties of two positions (referred to as "dual hatting").  Third, it complains that the NNSA, when evaluating SOC's proposed staffing of the Protective Force positions, improperly relied on the information included in the Informational Staffing Plan (Attachment 17) without analyzing the DPLH proposed by SOC.

Defendant and SOC broadly counter that Centerra's attacks on the NNSA's evaluation of SOC's staffing plan amount to nothing more than disagreements with the evaluation, and that such disagreements are insufficient to establish that the NNSA's rating of SOC's proposal under Criterion 1 was arbitrary, capricious, or contrary to law.  In addition, defendant and SOC assert that Centerra's allegations are premised on the erroneous assumption that the NNSA was required to use Centerra's staffing levels, rather than the PWS requirements, as the benchmark for evaluating SOC's staffing plan.  Both arguments are compelling.[8]

---

[8]  SOC further argues that in challenging the NNSA's evaluation of SOC's staffing plan, Centerra is attempting to add a requirement for a price realism analysis to the solicitation in contravention of the rule that proposals are only to be evaluated on the factors set forth in the solicitation.  "[A] price realism analysis considers whether an offeror's price is too low, such that it indicates a risk of poor performance and a lack of understanding of the solicitation

### a. The NNSA Supported Its Conclusion Regarding SOC's Proposed Staffing of the General Management Positions

Centerra first asserts that the NNSA did not support its conclusion that SOC's proposed staffing level was sufficient to perform the General Management tasks described in the solicitation.  It advances two arguments in support of this assertion.  First, in its motion, Centerra argues that the NNSA did not recognize "that SOC proposed to reduce existing General Management staffing hours by nearly [. . .]" and did not explain why this reduction "does not create a performance risk . . . ."[9]  Pl.'s Mot. 16.  Then, in its response to defendant's cross-motion, Centerra argues that the IPT failed to "elaborate on the 'added risks associated with [SOC's] leaner (in some areas) staffing plan'" or "explain why that staffing plan was a 'sufficient level of staffing.'"  Pl.'s Resp. 4-5 (quoting the IPT's report); accord id. at 7 (arguing that the NNSA's "determin[ation] that [SOC's] staffing level and mix of skills were adequate . . . was not based on any technical evaluation of SOC's 'leaner' . . . staffing approach because the IPT provided no such analysis").

With respect to its first argument, Centerra ignores that the NNSA was not obligated to compare SOC's staffing plan to the existing level of staffing.  In fact, the NNSA advised offerors that their staffing plans should be based on the information provided in the solicitation, and declared that the offerors did not need to know the existing staffing levels to prepare their proposals.  The NNSA further advised that it would "evaluate the information provided by the Offeror . . . to assess whether the Offeror has proposed a sufficient level of staffing and mix of skills throughout contract performance."  AR 1260.  Nowhere in the solicitation did the NNSA indicate that it would compare proposed staffing levels to existing staffing levels.

Centerra contends that notwithstanding the solicitation's lack of a requirement for the NNSA to compare existing and proposed staffing levels, the IPT actually did perform such a comparison.  This contention is based on two passages from the IPT's report:

---

requirements."  UnitedHealth Military & Veterans Servs., LLC v. United States, 132 Fed. Cl. 529, 554 (2017).  Because Centerra is challenging the NNSA's evaluation of SOC's staffing plan, and not the NNSA's evaluation of SOC's price, the court declines to address SOC's argument.

[9]  Centerra also complains that the IPT, when evaluating SOC's proposed staffing of the General Management positions, "seemingly ignored" the information that SOC included in its proposal under the heading "General Management Basis of Estimates."  Pl.'s Mot. 16.  However, the "General Management Basis of Estimates" section was part of SOC's price proposal, and the solicitation did not require the review of price proposals during the evaluation of technical proposals.  Thus, it was not improper for the IPT to disregard the information referenced by Centerra.

- "Overall, despite the added risks associated with its leaner (in some areas) staffing plan, SOC's staffing approach delineated a sufficient level of staffing and mix of skills throughout contract performance (with the four exceptions noted above)." Id. at 3623.

- "Being the incumbent contractor, Centerra's proposed approach generally follows its current concept of operations. By contrast, SOC was aggressive in its pricing, preferring to demonstrate best value to the Government with a combination of PWS performance and lean affordability." Id. at 3640.

These passages reflect nothing more than the IPT's awareness that SOC proposed both a lower level of staffing and a lower price than Centerra. Neither these passages, nor the remainder of the IPT's evaluation of SOC's staffing plan, include any detailed comparative analysis of the proposed and existing staffing levels.[10]

Centerra's second argument–made in response to defendant's cross-motion–is premised on its understanding that the "added risks associated with [SOC's] leaner (in some areas) staffing plan" noted by the IPT arise not from SOC's proposed dual hatting of employees, but from other, unspecified areas of leaner staffing. According to Centerra, instead of explaining these "added risks," the IPT relied on its finding that SOC could reallocate work or utilize its Corporate Governance Board, a finding that amounts to a concession that SOC's proposed staffing levels were inadequate. Centerra's reading of the IPT's report is strained in two respects.

First, the IPT's reference to SOC's "leaner (in some areas) staffing plan" should be read in the context of its entire evaluation. As noted above, the IPT initially remarked that SOC proposed a staffing plan with "a lean organization structure . . . ." Id. at 3622. It then described four instances–the dual hatting–in which the "lean organization structure" could increase performance risk. Next, it found that aside from the proposed dual hatting of employees, SOC understood the scope of work and proposed an adequate skill mix. Finally, the IPT concluded that "[o]verall, despite the added risks associated with its leaner (in some areas) staffing plan, SOC's staffing approach delineated a sufficient level of staffing and mix of skills throughout contract performance (with the four exceptions noted above)." Id. at 3623. Reading the IPT's analysis of SOC's staffing plan as a whole, it is reasonable to conclude that the IPT's use of the phrase "leaner (in some areas) staffing plan" referred to the four instances of dual-hatting employees and not to other, unspecified areas of leaner staffing. Such a conclusion is buttressed by the fact that in providing its overall evaluation of Criterion 1, the IPT mentioned only the four weaknesses assigned for the proposed dual hatting of employees, and not to risks associated with other areas of SOC's staffing plan.

---

[10] The court further notes that the second passage is from the IPT's evaluation of the offerors' price proposals, not the IPT's evaluation of SOC's staffing plan.

Second, the IPT's finding that SOC could reallocate work or utilize its Corporate Governance Board does not amount to a concession that SOC proposed insufficient staffing. To the contrary, the IPT found that SOC proposed sufficient staffing in most areas, and was only uncertain as to whether SOC proposed sufficient staffing in the instances where it proposed the dual hatting of employees. This uncertainty led the IPT to assign weaknesses and assess an increased performance risk. However, the IPT did not find that SOC proposed insufficient staffing.

In sum, Centerra has failed to establish that the NNSA did not support its conclusion that SOC proposed sufficient staffing of the General Management positions.

### b. The NNSA's Treatment of the Dual-Hatting Weaknesses Was Reasonable

Next, Centerra asserts that the NNSA provided a nonsensical rationale for discounting the four weaknesses it assigned to SOC's proposal for dual hatting employees performing General Management tasks. Specifically, Centerra remarks that although the NNSA recognized that dual hatting employees creates some performance risk, it erroneously determined that SOC would manage that risk by reallocating workloads (despite proposing a significantly reduced level of staffing) or by utilizing its Corporate Governance Board to provide a solution (even though the only purported solution available to the Corporate Governance Board was to add staff). In other words, Centerra contends that the methods of mitigating risk lauded by the NNSA would be ineffective because SOC did not propose a sufficient level of staffing to utilize those methods. However, the NNSA reasonably concluded, based on its comparison of SOC's proposal to the PWS, that although there was some risk that four employees might become overburdened due to the dual hatting, SOC proposed a sufficient level of staffing. Consequently, Centerra's contention amounts to nothing more than a disagreement with the NNSA's evaluation of SOC's staffing plan.

### c. The NNSA Evaluated SOC's Proposed Staffing of the Protective Force Positions in Accordance With the Solicitation

Finally, Centerra asserts that it was improper for the NNSA, when evaluating SOC's proposed staffing of the Protective Force positions, to rely on the information included in the Informational Staffing Plan (Attachment 17) without analyzing SOC's proposed DPLH. Centerra avers that the Informational Staffing Plan (Attachment 17) was merely the starting point for proposing staffing levels, and that offerors were required to determine the number of FTEs and DPLH necessary to cover the positions described in the plan. According to Centerra, because SOC did "not provide specific information regarding time allowed for muster and travel to and from posts," training, or relief, the NNSA could not have known how SOC arrived at its DPLH. Pl.'s Mot. 21.

It is apparent that Centerra is confounding the requirements for the technical proposals and the requirements for the price proposals. With respect to the staffing plan portion of the technical proposals, section L of the solicitation provided:

> The Offeror shall describe the labor categories and job duties of all proposed labor categories to perform the work required by the entire PWS. The plan shall also identify the estimated quantity of proposed [FTE employees] allocated to each labor category for the basic period and for each option period as well as in a Staffing Plan Summary (see Attachment 11).

AR 1260. SOC complied with these requirements in the staffing plan section of its technical proposal. See id. at 2662 ("Figure 1.2.1-1 defines each position in SOC's organization, grouped by the labor categories provided in RFP attachment 11, and the job duties assigned to ensure successful completion of the entire PWS. Per the RFP, estimated FTEs for each labor category appear in this table as well as in the Staffing Plan Summary (Attachment 1-1)."), 2665 (setting forth the labor categories, job duties, and proposed FTEs for the Protective Force positions), 2686 (containing the portion of the Staffing Plan Summary (Attachment 11) applicable to the Protective Force positions). The information referenced by Centerra–time for muster, travel, training, and relief–was not required to be included in the staffing plan portion of the technical proposals. Rather, that information was to be included in the price proposals; specifically, the solicitation indicated that proposed prices were to include fully burdened labor rates and that offerors were to explain the basis for their proposed labor rates. Moreover, section M of the solicitation did not include any specific requirement that the NNSA analyze proposed DPLH when evaluating an offeror's staffing plan; all the NNSA was required to do was to "assess whether the Offeror . . . proposed a sufficient level of staffing and mix of skills throughout contract performance." Id. at 1260. In sum, NNSA's failure to analyze SOC's proposed DPLH when evaluating SOC's staffing plan was not error.

### d. Conclusion

As discussed above, Centerra's challenges to the NNSA's evaluation of SOC's staffing plan under Criterion 1 lack merit. The NNSA's evaluation was not arbitrary, capricious, or inconsistent with the evaluation criteria.

### 3. The NNSA Properly Evaluated the Price Proposals

Centerra next contends that the NNSA's evaluation of the price proposals was arbitrary, capricious, and inconsistent with the evaluation criteria in three respects. First, it claims that the IPT mischaracterized the reason for the difference in prices between the two proposals and that this mischaracterization was erroneously adopted by the SSA in his source selection decision. Second, it asserts that the NNSA did not properly assess the risk of SOC's decision [. . .] labor rates in the option years. Third, it argues that the NNSA should have found risk in SOC's low proposed rates of profit. Defendant and SOC dispute all of Centerra's contentions.

With respect to its claim that the IPT mischaracterized the difference between the offerors' proposed prices, Centerra asserts that instead of characterizing "the overall price difference as being attributable [. . .]% to indirect cost differences and [. . .]% to profit differences," the IPT should have recognized that the overall price difference was attributable to Centerra's higher number of proposed DPLH, "reflective of a higher quality and lower risk proposal." Pl.'s Mot. 23.  It further asserts that the IPT's purported mischaracterization of the overall price difference "distorted the tradeoff of technical merit versus price, making it appear that Centerra was not offering more value for its higher price." Id.  As a result, Centerra contends, the IPT "misled the SSA." Id.; accord Pl.'s Resp. 13-14 (contending that the SSA failed to "document the difference in DPLH between the two proposals" and did "not address the staffing differences between the two proposals, whether in DPLH or FTEs").  Centerra's position cannot be sustained, for several reasons.  First, contrary to Centerra's assertion, the IPT did note that Centerra's proposed labor hours contributed to its higher proposed price, commenting that Centerra proposed [. . .]% more General Management DPLH than SOC at a [. . .]% higher price, and that Centerra proposed [. . .]% more DPLH in the other areas than SOC at a [. . .]% higher price.  Second, by not challenging the accuracy of the IPT's calculations, Centerra concedes that the IPT accurately described the price differences.  Finally, Centerra's correlation of a higher proposed price with a higher quality proposal reflects, once again, its mistaken impression that SOC's staffing plan should be measured against existing staffing levels rather than against the requirements of the PWS.  In short, the IPT did not mischaracterize the difference between the offerors' proposed prices.  Consequently, the SSA could not have been misled by the IPT.

Centerra's other two contentions are equally unpersuasive.  In support of its contention regarding SOC's decision [. . .] labor rates, Centerra asserts that the premise of SOC's assumption that employee turnover would result in cost savings sufficient to offset salary increases was that SOC would replace higher-paid, more-experienced employees with lower-paid, less-experienced employees, and that having lower-paid, less-experienced employees was a performance risk not recognized by the IPT.  And, in support of its contention regarding SOC's proposed rates of profit, Centerra asserts that SOC's low proposed rates would restrict SOC's ability to increase its General Management staffing (the firm-fixed-price portion of the contract) to the level necessary to perform the work required by the contract, creating a performance risk that was not recognized by the IPT.  However, pursuant to section M of the solicitation, the IPT was only required to determine whether the offerors' proposed prices were reasonable and balanced.  Centerra fails to explain how the purported performance risks rendered SOC's proposed price unreasonable or unbalanced.  Indeed, to the extent that SOC's lower proposed price is indicative of a performance risk, the existence of such a performance risk does not automatically render SOC's proposed price unreasonable or unbalanced.

In sum, Centerra has not established that the NNSA's evaluation of the offerors' price proposals was arbitrary, capricious, or inconsistent with the evaluation criteria.

### 4. The SSA Properly Performed the Best Value Tradeoff

Finally, Centerra contends that the SSA's tradeoff decision was arbitrary, capricious, and inconsistent with the award criteria in two respects.  First, it asserts that because the NNSA erred in evaluating SOC's staffing plan and the price proposals, the SSA could not have conducted a proper tradeoff analysis.  Second, it argues that the SSA did not properly weigh the evaluation criteria–giving too much weight to Criterion 4 (Price)–when conducting his tradeoff analysis.  As suggested by defendant and SOC, Centerra's first contention is rendered moot because the court has found that the NNSA's evaluation of SOC's staffing plan and the price proposals was not arbitrary, capricious, or inconsistent with the evaluation criteria.  Defendant and SOC also correctly contend that the SSA's weighing of the price and nonprice criteria was proper.

Under the FAR, a procuring agency must document its source selection decision, and that documentation must "include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs."  FAR 15.308 (2016).  Even if a solicitation provides that technical evaluation criteria are more important than price, the "magnitude of the price differential" between two proposals remains relevant because "logic suggests that as that magnitude increases, the relative benefits yielded by the higher-priced offer must also increase."  Serco Inc. v. United States, 81 Fed. Cl. 463, 497 (2008).  "To conclude otherwise[] threatens to 'minimize[ ] the potential impact of price' and, in particular, to make 'a nominal technical advantage essentially determinative, irrespective of an overwhelming price premium.'"  Id. (second alteration in the original) (quoting Coastal Sci. & Eng'g, Inc., 69 Comp. Gen. 66, 67 (1989)).  Thus, when performing a tradeoff analysis, a procuring agency "must select a lower-priced, lower technically scored proposal if it reasonably decides that the premium associated with selecting the higher-rated proposal is unwarranted."  Id. at 496; accord Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 514 (2009); Banknote Corp. of Am., 56 Fed. Cl. at 390.

In his tradeoff analysis, the SSA noted that Criterion 1 did not weigh in favor of either offeror and that although Centerra's proposal was more highly rated on Criteria 2 and 3, both offerors could successfully perform the contract.  The SSA then recognized that the solicitation provided both that the nonprice factors, when combined, were "'significantly more important than price,'" and that the NNSA would "'not make an award at a price premium it considers disproportionate to the benefits associated with the evaluated superiority of one Technical Proposal over another.'"  AR 3727 (quoting the solicitation).  In light of the technical ratings, the offerors' proposed prices, and the pertinent solicitation provisions, the SSA concluded:

> The price premium associated with Centerra's proposal is not justified by the evaluated superiority of Centerra in relation to Criteria 2 and 3.  Under the most important non-price factor, Approach and Staffing Plan, both Centerra and SOC were evaluated to present similarly beneficial (though different) technical approaches and staffing plans.  As such, should Centerra receive the award, the Government would be paying a 23% price premium for a slightly higher

probability of successful performance and a greater use of small businesses. Under no circumstances are these advantages worth the 23% price premium (or $52 million over the potential contract performance period). Therefore, . . . it is not in the best interest of the Government, nor in line with the stated evaluation criteria for trade-off, to issue an award to Centerra at the proposed 23% price premium. As stated above, SOC's proposal demonstrated that it was more than capable of performing the work, and would, in my judgment, provide performance and benefits proportionate to its evaluated price.

Id. The SSA's conclusion is consistent with the evaluation criteria set forth in the solicitation; even though Price was the least important criterion, the SSA was well within his authority to determine that the magnitude of the price premium rendered the benefits provided by a more highly rated technical proposal insignificant. Accordingly, the SSA's tradeoff analysis was not arbitrary or capricious.

### 5. Centerra's Protest Fails on Its Merits

Centerra has failed to establish that the NNSA's award of the protective force services contract to SOC was arbitrary, capricious, or contrary to law.[11] In other words, it has not succeeded on the merits of its claims. Therefore, the court need not address the remaining elements of Centerra's request for injunctive relief.

### III. CONCLUSION

For the reasons set forth above, although Centerra has standing to protest the NNSA's award of the protective force services contract to SOC, its protest cannot be sustained on its merits. Thus, the court **DENIES** Centerra's motion for judgment on the administrative record, **GRANTS** defendant's cross-motion for judgment on the administrative record, and **GRANTS IN PART** and **DENIES IN PART** SOC's cross-motion for judgment on the administrative record. Centerra's complaint is **DISMISSED**. No costs. The clerk shall enter judgment accordingly.

The court has filed this ruling under seal. The parties shall confer to determine agreed-to proposed redactions. Then, by **no later than Friday, January 12, 2018**, the parties shall file a

---

[11] Consequently, the court need not determine whether Centerra was prejudiced by the NNSA's evaluation of proposals or tradeoff analysis.

joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated.**

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge